IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 3:10cr0046 |
| | ) | |
| | ) | JUDGE HAYNES |
| STEVEN DWAYNE PITTMAN | ) | |

## MEMORANDUM

The United States of America filed this criminal action against defendant Steven Dwayne

Pittman, charging him with being a previously convicted felon in possession of a firearm and

possession with intent to distribute five grams or more of a substance containing cocaine base.

(Docket Entry No. 1).

Before the Court is Defendant's motion to suppress (Docket Entry No. 30), to which the

Government has responded (Docket Entry Nos. 31, 47), and Defendant filed a reply (Docket

Entry No. 50). Defendant asserts that the physical evidence and statements obtained as a result

of his traffic stop on October 7, 2009 and the consent search of his residence should be

suppressed as a violation of his Fourth and Fifth Amendment rights. Specifically, Defendant

contends that the traffic stop was pretextual and was not based upon probable cause, his

statements were taken in violation of Miranda,[1] and the consent search of his residence was

actually coerced. The Court held a suppression hearing on May 24, 2011. (Docket Entry No. 54,

Transcript). Both parties submitted post hearing briefs. (Docket Entry Nos. 57, 58). The

Defendant filed a supplemental request for permission to reply to the Government's response

(Docket Entry No. 59), and the Government filed a response in opposition. (Docket Entry No.

---

[1] Miranda v. Arizona, 396 U.S. 868 (1969).

1

60). As provided for in the Court's Order of July 21, 2011, the Government filed a supplemental response on the Defendant's constitutional challenge and waiver. (Docket Entry No. 62). For the reasons stated below, Defendant's motion to suppress should be denied.

## A. ANALYSIS OF THE EVIDENCE

Metropolitan Nashville Police Department Detectives Seth Ranney[2] and Julian Pirtle testified at the suppression hearing. On October 7, 2009, a paid confidential informant ("CI") informed Detective Ranney about a potential drug transaction. (Docket Entry No. 54, at 7). The CI had previously provided reliable information in approximately 200 to 300 criminal investigations. Id. at 6. The CI told Detective Ranney that he/she could arrange a purchase of cocaine from an individual who would be driving a gold colored Chevy Impala with dark tinted windows. Id. at 7. The CI had a telephone conversation with this individual and Detective Ranney listened to the conversation on speaker phone. Id. at 7-8. The purpose of the conversation was to arrange a drug transaction that was to occur at the Walmart on Hamilton Church and Park. Id. At this meeting, the CI was to purchase seven grams of crack cocaine from the individual for $375. Id. at 8.

### 1. The Encounter Between Impala and CI at Walmart

After the telephone conversation, Detective Ranney contacted other officers, searched the CI and the CI's vehicle, provided $375 of buy money to the CI, equipped the CI with an electronic listening device, and traveled to Walmart. Id. A few minutes after arriving at the Walmart, Detective Ranney observed a gold colored Chevy Impala with dark tinted windows arrive at the location at the appointed time, that was the same make, model, and color vehicle that the CI had identified. Id. at 8-9. This vehicle "travel[ed] on Murfreesboro Road, turned left

---

[2] By the suppression hearing, Detective Ranney had moved to Illinois and was employed by the Perkin Illinois Police Department. Id. at 4-5.

onto Hamilton Church Road. . . turned left into the Wal-Mart parking lot . . [and] travel directly to the gas pumps area, and the vehicle pulled up next to the vehicle that the informant was in." Id. at 9. Detective Ranney observed the brief encounter, but did not personally observe a hand-to-hand exchange between the driver of the Impala and the CI. Id. at 10, 11, 36. Detective Ranney explained: "The Impala pulled up, stopped next to the informant's vehicle for approximately five seconds. I didn't hear any transaction take place. I could see that they were – because I had closer cover, and I couldn't see what was going on, stops for about five seconds, and then speeds away very quickly, going up to the Hamilton Church exit." Id. at 9. At the time Defendant departed, there was only the telephone conversation with the CI to suspect Defendant of a narcotics crime. Id. at 37-38.

Detective Pirtle testified that he initially came into contact with Defendant's vehicle at the Walmart while conducting surveillance. Id. at 65. "We saw the CI vehicle, we saw the defendant arrive in his vehicle. At that time the defendant left. We could overhear a conversation between the defendant and the CI. The defendant left the Wal-Mart parking lot. Our units followed him out of the parking lot." Id. at 65-66.

## 2. The Traffic Violation

Detective Ranney "requested that my agent stay with the informant. And Officer Hardin and I were in the same vehicle. We went behind the gold Impala, followed it as it turned left onto Hamilton Church out of the Walmart." Id. at 9-10. Detective Ranney testified that he observed Defendant make a left turn without a turn signal.

> A.    We pulled out behind the vehicle, the Impala. It traveled -- a guesstimate would be a quarter mile to a half mile up Hamilton Church, then turned left into 3001 Hamilton Church, which is a fairly large apartment complex.

**Q.**     **Did the defendant -- did the gold colored Impala signal before turning?**

**A.**     **No, sir.**

**Q.**     **Could you see that clearly?**

**A.**     **Yes, sir.**

Q.     If it had signaled, would you have been in position to see it?

A.     Yes.

**Q.**     **Did it impede traffic in any way?**

**A.**     **No.**

**Q.**     **Did he turn?  Did he not impede traffic in any  way?**

**A.**     **There was cars coming towards Murfreesboro Road. There was no turn signal. They didn't have to slam on their brakes, but they obviously -- the Impala turned out in front of a car, and then the car passed, and then we turned out after it.**

**Q.**     **So what effect did it have on the other car, then?**

**A.**     **I mean, it didn't signal, so that car coming -- you know, it was unknown what the Impala's intentions were.**

**Q.**     **Did it affect the movement of another vehicle?**

**A.**     **I would say yes.**

Q.     Okay. And what happened after he turned into the apartment complex?

A.     He turned, a car passed that was traveling towards Murfreesboro Road on Hampton Church. We pulled in behind it, activated emergency lights and conducted a traffic stop.

Id. at 11-12 (emphasis added).  See also id. at 44 (approaching vehicle did not present any unsafe condition).

The Government asked Detective Ranney about his familiarity with the Metropolitan Davidson County Ordinance regulating turn signals, Municipal Code § 12-16-110. The Government authenticated Municipal Code § 12-16-110 through Detective Ranney. Id. at 21. Detective Ranney testified that he received training on the Municipal Code and was familiar with this code provision. Id. at 17, 18. Detective Ranney testified that in his experience Municipal Code § 12-16-110 was frequently used and turn signal offenses were common traffic offenses. Id. at 32, 43. Noting Defendant's objection,[3] the Court entered the ordinance as Government's Exhibit 2 to the suppression hearing. (Docket Entry No. 53, Exhibit 2).

Defense counsel asked Detective Ranney about his familiarity with the Tennessee state statute regulating turn signals, Tennessee Code Annotated § 55-8-143. Id. at 26.

Q. What did you learn about the Tennessee statute regarding left-hand turn signals?

A. . . . if it may affect traffic, that they have to signal in a left-hand turn.

Q. Okay. If it affects traffic; is that right?

A. **It may affect traffic**.

* * *

Q. Well, you just testified earlier about what Mr. Pittman's vehicle was doing at the time. You said something about another vehicle; is that right?

A. That there was another vehicle coming towards Murfreesboro Road?

Q. Right. You said it could have been affected or something like that. Is that what you said?

---

[3] Contending that "this whole issue turns on whether the ordinance or the statute was applicable," id. at 20, defense counsel objected to admission of the Municipal code arguing the lack of a competent witness to authenticate the ordinance. Id. at 18. Given the witness's familiarity with this section, the Court overruled the objection.

A.    Correct.

Q.    Did you testify to that at the preliminary hearing?

A.    I don't recall.

Q.    Do you recall being asked specific questions about the left-hand turn signal?

* * *

A.    I believe he was asking questions about where --did anybody have to stop or anything like that, if I remember correctly.

Q.    Okay. No cars had to stop for him?

A.    That's correct.

Q.    That was one of the questions. And your answer was?

A.    No.

Q.    No. No cars had to slow down when he turned in.  And your answer was?

A.    No.

Q.    And basically, your car was -- was there a car in between your vehicle and Mr. Pittman's vehicle?

A.    No.

Q.    There was not?

A.    No.

* * *

Q.    When Mr. Pittman made a left-hand turn into the apartment complex, were there any other vehicles obstructing his path?

A.    There was a vehicle coming towards his vehicle, towards Murfreesboro Road.

* * *

A       … And I said, no, there was a vehicle coming the other way; in fact, it was close enough to where, when Mr. Pittman made his turn, the car passed, **it was close enough where we couldn't make the turn also. And so we had to wait for that car to go through, and then we turned into the apartment complex after that.**

Q.       You had to wait. Do you know how far the distance was between that car and Mr. Pittman's car?

A.       I don't know.

* * *

A.       **[After reviewing transcript] the only thing I said [at preliminary hearing] is that he turned in, this car passed, and then we turned in behind him.**

Q.       Okay. And it's also fair to say, sir, that you never at all talked about a municipal ordinance at your testimony, did you?

A.       No.

Q.       … [Y]ou didn't put a municipal ordinance in your report, did you?

* * *

**A.       No, I just put the violation.**

**Q.       You just said left-hand turn.**

**A.       Right.**

Q.       You were aware, though, at that time, sir, that there was also a state statute?

A.       Correct.

Q.       And you say you were also aware that there was a municipal ordinance at that time?

A.       Correct. Yes.

Q.       Did you try resolve any potential conflicts between the two?

A.       No.

> **Q.** Have you ever stopped anyone in your career for violating a municipal ordinance?
>
> **A.** Yes.
>
> **Q.** How many and when?
>
> **A.** Well, before I was in the crime suppression unit, I was in a Flex Unit with Metro. And the majority of our nights were traffic stops. And we made lots of municipal --this is a common municipal code.

Id. at 26-32 (emphasis added).

Detective Pirtle followed the Defendant in a separate car behind Detective Ranney's vehicle and also observed the Defendant make a left turn without a turn signal. Id. at 66. Detective Pirtle thought he recalled another vehicle coming towards them, but did not remember that vehicle having to swerve or slam on the brakes. Id. at 66, 83-84. Detective Pirtle described the Defendant's action as impeding traffic. Id. at 66, 82. Detective Pirtle noted that "people's definition of impeding traffic is different" and "hazy," but he believed Defendant's actions impeded traffic because **"I was behind Detective Ranney, so [Detective Ranney] did have to hit his brakes, because we weren't sure he was going to make that turn, so -- and Detective Ranney did have to hit his brakes."** Id. at 82 (emphasis added). Detective Ranney engaged in the following dialogue with the Court on this point:

> Court: I have a question. Did I understand you to say that you recall braking as he turned?
>
> A. I recall the detective in front of me.
>
> **Court:** **You hit the brakes, or the car in front of you hit the brakes?**
>
> **A.** **The car in front of me hit the brakes, because I had to slow down so that I wouldn't run into Detective Ranney.**
>
> **Court:** **So did you hit the brakes because the vehicle in question was turning, or did you hit the brakes because you were too close?**

8

**A.**           **I hit the brakes because I saw Detective Ranney hit his brakes, and I was trying to catch up to where they were, and I didn't want to run into the back of Detective Ranney. If that makes sense.**
           **Turning out of the Wal-Mart parking lot, following Detective Ranney, when this vehicle began to make his left turn, before -- I guess before he actually initiated the left turn, I seen Detective Ranney hit his brakes, so I kind of hit mine as well so I wouldn't run into the back of Detective Ranney.**

Id. at 91 (emphasis added).

The Defendant filed a diagram of Hamilton Church Road that the officers marked as Defendant's Exhibit 1 to the suppression hearing.

### 3.   The Traffic Stop

After observing the left turn without turn signal, at approximately 6:00 p.m., Detective Ranney initiated a traffic stop, approached Defendant's vehicle, and identified Defendant as the driver and sole occupant. Id. at 12-13. Detective Ranney did not inform Defendant why he was stopped when he first approached the vehicle. Id. at 40. Detective Ranney "asked [Defendant] to step out of the vehicle. I asked him if he had anything illegal in the vehicle." Id. at 13.

**Defendant responded: "I just fucked up my life. And [Defendant] said that there was cocaine in the center console."** Id. at 13 (emphasis added). See also id. at 67-68. This statement was within five to ten seconds of the beginning of the traffic stop. Id. at 13. Detective Ranney did not consider Defendant free to go when he asked Defendant to step out of his vehicle, but he was not then placed under arrest. Id. at 57-58. After Defendant exited the vehicle, officers "recovered a baggie of white rock-like substance out of the center console, along with a digital scale.[4] At that point in time, [Defendant] was placed under arrest." Id. at 13. Some point later in the encounter, Detective Ranney informed Defendant they were investigating

---

[4] Detective Ranney also recovered approximately $1000 from Defendant's pants pocket, which did not include buy money. Id. at 16, 52.

an "arrangement at the Wal-Mart for a drug transaction" and that Defendant "hadn't used a turn signal." Id. at 40-41. Detective Ranney did not issue Defendant a traffic citation for the traffic violation. Id. at 41.

Detective Pirtle testified that he administered Defendant's Miranda warnings within the first five to ten minutes of the traffic stop.

Q. And after the traffic stop, what happened next?

A. Detectives approached the vehicle, made contact with the driver. The driver made a comment in relation to messing up, or -- I don't know his exact words, but he made reference to the fact that he had messed up, he was asked out of the vehicle.

\* \* \*

Q ...[W]hat had been said to him that he responded with, I messed up?

A. He was asked if he had anything illegal in the vehicle -- any weapons, narcotics.

Q. Who asked that?

A. Detective Ranney.

Q. And you overheard that?

A. Yes. . . [.]

Q. And the response was what?

A. Man, I just messed up my life, wrecked up my life, or something to that effect.
\* \* \*

Q. What happened next?

A. He was asked out of the vehicle. We started talking to him. The drugs that he stated were in the center console were retrieved. **He was read his Miranda rights.**

Q. **Were you present for the reading of the Miranda rights?**

A.    Yes, sir. Yes, sir.

Q.    Did you hear them?

A.    Yes, sir. I went over his Miranda with him.[5]

Q.    Now, how long had he been detained when made the statement that he had just messed up?

A.    I mean, it was almost instantaneous, I want to say. It wasn't -- if not instantaneous, it was shortly after the stop was made.

Q.    How long had he been detained when you read him his -- when you heard the Miranda rights read to him?

A.    Within the first five to ten minutes.

Q.    Did that include right to remain silent?

A.    Yes, sir.

Q.    The right to consult with an attorney?

A.    Yes, sir.

Q.    And was he notified at that point in time that anything he said could and would be used against him?

A.    That's correct.

Q.    Did he waive his Miranda rights and wish to speak?

A.    Yes, he did.

Q.    And what did he tell you?

A.    We began talking about possible things that he could do. I think he talked about possibly being able to, you know, get a quantity of narcotics for us, I think it was half a kilo or somewhere around a quarter key, something to that effect. Talked about the drugs in the vehicle, and maybe something else at the house that he would have.

Q.    Did the subject turn to what might be at his house?

---

[5] Detective Pirtle gave Defendant Miranda warnings by memory and did not complete a Miranda waiver or federal firearm form. Id. at 86-89. Pirtle does not commonly complete these forms. Id.

11

A.    Yes, sir.

Q.    And what did he tell you about that?

A.    I believe that he may have had a weapon or some more drugs at the house.

Q.    And was he telling did you that on the scene?

A.    Yes, sir.

Id. at 67-69, 86 (emphasis added).

Detective Ranney testified he did not give Defendant <u>Miranda</u> rights until after the consent search of the residence and did not hear another officer give <u>Miranda</u> warnings at the traffic stop, but he was absent during an early portion of the traffic stop.

Q.    Was [Defendant] read his Miranda rights?

A.    I did not read him his Miranda rights.

Q.    Did you hear anybody read him his Miranda rights at that time?

A.    I did not at that time.

Q.    Okay. What happened next?

**A.    At that point in time I had to leave the scene for a few minutes and go back and get the buy money from the informant, was gone just a few minutes, enough to recover the money and returned to the original location of the stop at 3001 Hamilton Church.**

Q.    Was defendant still there?

A.    He was.

Q.    Was he being questioned at the scene?

A.    Yes.

Q.    Now, was he taken from the scene at that point in time and taken to the station or anything?

A.    No, sir.

Id. at 13-14 (emphasis added). After considering the uncontroverted evidence offered by the detectives, the Court concludes that Detective Pirtle administered Miranda warning to Defendant during the short time period when Detective Ranney was absent from the scene in the beginning of the traffic stop.

### 4. The Search of Defendant's Residence

At some point later in the encounter, Detective Ranney requested that Defendant provide consent to search his residence and read the consent to search form verbatim to Defendant. Id. at 14, 50. Defendant provided written consent while seated in a vehicle outside the residence. Id. The executed consent form was admitted as Government Exhibit 1 to the Suppression Hearing. Id. at 15. The Defendant signed the consent to search form, but Detective Ranney did not. Id. at 48-49. Detective Ranney explained how he obtained the consent to search from Defendant as follows:

> **A.** Mr. Pittman was extremely cooperative. . . I went over, read the departmental consent to search form verbatim to Mr. Pittman in the presence of Sergeant Fiddler. **Mr. Pittman consented to a search of his residence.**
>
> **Q. Did you threaten him at that point in time?**
>
> **A. No, sir.**
>
> **Q. Did he ever tell you that he didn't understand or had any questions along that point in time?**
>
> **A. No, sir.**
>
> **Q. Did he ever invoke any of his Miranda rights or say he wanted to talk to an attorney, to remain silent?**
>
> **A. No, sir.**

Id. at 14-15 (emphasis added).

After the firearms were recovered, Defendant was provided <u>Miranda</u> rights for the second time. Detective Ranney testified:

Q.  Now, were you present for the search of his house . . . [.]?

A.  Yes, sir.

Q.  And did you recover firearms at that point in time?

A.  I did.

Q.  How many?

A.  Two.

**Q.  At that point in time, did you read him his Miranda rights again?**

**A.  I did.**

Q.  Did the defendant make a statement after waiving his Miranda rights?

A.  Yes, sir.

Q.  Did he acknowledge that he had recently purchased both those firearms?

A.  Yes.

Q.  Did he tell you he paid 60 bucks for one and 200 for the other?

A.  That's correct.

<u>Id</u>. at 16-17 (emphasis added).  Defendant's children were present during the search of the residence.  Detective Ranney chose not to remove Defendant's handcuffs so he could sign the gun questionnaire due to officer safety concerns.  <u>Id</u>. at 61-63.

Detective Pirtle also testified about the consent search of Defendant's residence.

Q.  Did you go to the actual house where he said he lived?

A.  Yes, we did.

Q.  And did he execute a consent waiver?

A. Yes, he did.

Q. Did you witness that?

A. Yes.

Q. I'm talking about the actual search the house.

A. Yes, I did. I was present.

Q. And were other items found there?

A. There were, I believe, two firearms found at the house. One was -- now, I don't want to get into the exact locations of where they were, but I know there were two firearms found at the house.

**Q. Now, at any point in time when you read Miranda rights or when you asked him for consent to search, did anyone threaten him in any way?**

**A. No, sir.**

**Q. Did he ever invoke his Miranda rights at any point in time?**

**A. No, sir. No, we were very pleasant.**

**Q. Did he ever ask you any questions or did you have any reason to think he might be confused?**

**A. No, sir. No, sir. He was very coherent, understanding. And we were very pleasant, because, you know, at the time he was talking about possibly doing something else in relation to getting more narcotics.**

**Q. So it was all very collegial.**

**A. Yes, very.**

* * *

**Q. Did anybody threaten to take his children into state custody if he didn't sign a consent waiver?**

**A. I didn't overhear anybody say that, no, sir.**

Q. Have you ever heard anybody?

A.    No, sir. No, sir. We traditionally -- when you ask for consent, you don't coerce or intimidate anybody.

Q.    Was the defendant very forthcoming? Would he have needed to be threatened?

A.    Yes, sir. Everything was pretty cordial. I mean, everything was pretty cordial. As I said before, he was, you know, talking about possibly working or, you know, flipping to something else, so we had everything on a level.

Id. at 69-71 (emphasis added).

## B.    CONCLUSIONS OF LAW

The Fourth Amendment protects individuals from unreasonable searches and seizures and evidence that stems from unreasonable searches or seizures must be suppressed. Wong Sun v. United States, 371 U.S. 471, 488 (1963). Traffic stops are seizures within the meaning of the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809-10 (1996). "Stopping and detaining a motorist 'constitute[s] a seizure' within the meaning of the Fourth Amendment even if 'the purpose of the stop is limited and the resulting detention quite brief.'" United States v. Bell, 555 F.3d 535, 539 (6th Cir.2009).

"Under the Fourth Amendment, there are three types of permissible encounters between police and citizens: consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions; a temporary involuntary detention or Terry[6] stop which must be predicated upon 'reasonable suspicion;' and arrests which must be based on probable cause." United States v. Alston, 375 F.3d 408, 411 (6th Cir. 2004) (quoting United States v. Bueno, 21 F.3d 120, 123 (6th Cir. 1994)).

In Gaddis v. Redford Twp., the Sixth Circuit summarized the circuit's traffic stop jurisprudence as follows:

---

[6] Terry v. Ohio, 392 U.S. 1 (1968).

Police may make an investigative stop of a vehicle when they have reasonable suspicion of an ongoing crime, whether it be a felony or misdemeanor, including drunk driving in jurisdictions where that is a criminal offense. Police may also make a stop when they have reasonable suspicion of a completed felony, though not of a mere completed misdemeanor.

**Next, police may make a stop when they have probable cause to believe a civil traffic violation has occurred, even if the defendant raises a claim that the stop was pretextual . . . [.]**

364 F.3d 763, 771, n. 6 (6ᵗʰ Cir. 2004) (citations omitted and emphasis added).

In the Sixth Circuit, as a <u>completed</u> misdemeanor traffic violation, probable cause is required to justify the traffic stop of Defendant for the left turn traffic offense. <u>United States v. Guajardo</u>, 388 Fed. Appx. 483, 487, 2010 WL 3069605 (6th Cir. Aug. 5, 2010); <u>United States v. Torres-Ramos</u>, 536 F.3d 542, 550 (6th Cir. 2008). "The requirements of probable cause are satisfied where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." <u>United States v. Davis</u>, 430 F.3d 345, 352 (6th Cir. 2005) (citations omitted). When there exists probable cause for the traffic stop, "the officer's subjective intent for executing the stop is irrelevant." <u>Torres-Ramos</u>, 536 F.3d at 550.

### 1. Validity of initial traffic stop

The Defendant argues that the initial traffic stop was improper because: (1) Municipal Code § 12-16-110 should not be considered or is unconstitutional;[7] (2) the Defendant did not commit a traffic violation under Tenn. Code. Ann. § 55-8-143; and (3) the attempted narcotics transaction did not provide a basis for the traffic stop. (Docket Entry Nos. 30, 57, 59).

---

[7] Defendant first raised the constitutionality of the Municipal Code in his request for permission to reply to Government's response to Defendant's post hearing brief. (Docket Entry No. 59). As will be addressed herein, the Government argued Defendant waived this issue and that the argument also fails on the merits. (Docket Entry No. 62).

The Government responds that the traffic stop was permissible because Defendant violated both Municipal Code § 12-16-110 and Tenn. Code. Ann. § 55-8-143 by making a left turn without a turn signal. (Docket Entry Nos. 47, 58). The Government also contends that the traffic stop was supported by reasonable suspicion "that the defendant had arrived at the Walmart parking lot with the drugs he was to sell to the CI" based upon the monitored telephone call and Detective Ranney's observation of the gold Impala arriving at the purchase location and pulling up momentarily to the CI's vehicle. (Docket Entry Nos. 31, 47). The Government further argues that even if Defendant had been improperly detained, suppression would not be proper under Herring v. United States, 555 U.S. 135 (2009). (Docket Entry No. 47, at 10-13).

The Metropolitan Davidson County Ordinance regulating turn signals, Municipal Code § 12-16-110, provides:

A. No person shall turn a vehicle at an intersection unless the vehicle is in proper position upon the roadway as required by Section 12.16.140, or turn a vehicle to enter a private road or driveway, or otherwise turn a vehicle from a direct course, or move right or left upon a roadway unless and until such movement can be made with reasonable safety. No person shall so turn any vehicle without giving an appropriate signal in the manner hereinafter provided. When turning a vehicle at an intersection or to enter a private road or driveway, a person shall yield the right-of-way to bicycles traveling lawfully within a bicycle lane, shoulder, sidewalk or on the roadway.

B. A signal of intention to turn right or left when required shall be given continuously during not less than the last fifty feet traveled by the vehicle before turning.

C. No person shall stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal in the manner provided herein to the driver of any vehicle immediately to the rear when there is opportunity to give such signal.

D. The signals provided for in subsection B of Section 12.16.120 shall be used to indicate an intention to turn, change lanes or start from a parked position, and shall not be flashed on one side only on a

> parked or disabled vehicle, or flashed as a courtesy or "do pass"
> signal to operators of other vehicles approaching from the rear.

E.  Section 12.84.020 sets out the penalty for violation of subsections A
through D of this section.

Metro Government of Nashville and Davidson County, Tenn., Code of Ordinances, § 12.16.110

(2011) (emphasis added).

At the suppression hearing, Defendant argued that "this whole issue turns on whether the

ordinance or the statute was applicable." (Docket Entry No. 54, at 20). The Defendant

challenged the admissibility of the Municipal Code on the grounds that there was no competent

witness to certify it and there was no certification from a custodian of records. Id. at 18-19. The

Government offered Detective Ranney's testimony that he received training on the Municipal

Codes, he was familiar with § 12-16-110 on the date in question, it was a common ordinance,

and he often made traffic stops for turn signal violations. The Court admitted the exhibit after

noting Defendant's objection because "in terms of [the ordinance's] admissibility, [Detective

Ranney] said, I was trained, and this is what I recall being trained on" and the ordinance was not

being admitted as an official record. Id. at 19-20.

The only reference to the municipal ordinance in Defendant's post hearing brief was

contained in a footnote, stating:

> The government has attempted to supplement the state statute with the internet
> printout of a municipal ordinance. This unauthenticated document should not be
> considered part of the record. Moreover, a close reading of the ordinance reveals
> it to comport with the state statute: a driver must use "an appropriate signal" . . .
> "when required in this title," which in turn references "reasonable safety". The
> government has put on no evidence to support interpreting this ordinance to
> require that a turn signal is always required—even if a car were alone on a
> deserted road.

(Docket Entry No. 59, at 5, n.2). The Government responded that the ordinance did not need to be authenticated, and regardless, the ordinance was properly authenticated through Detectives Ranney and Pirtle. (Docket Entry No. 58, at 8).

For the first time in Defendant's request to reply to the Government's post hearing brief, Defendant asserts a skeletal constitutional challenge to § 12-16-110 on the grounds that it conflicts with Tenn. Code. Ann. § 55-8-143 by always requiring a turn signal. (Docket Entry No. 59, at 5). "While the issue remains unsettled under Tennessee law, any municipal ordinance that conflicts with Tennessee law should be deemed invalid. See generally Smith Amusement Co. v. City of Chattanooga, 205 Tenn. 712 (1959) (striking down municipal law more restrictive than state law on the subject); Tenn. Code Ann. § 55-10-307(a) (reflecting principal that municipal traffic code cannot conflict with state law)." Id.

The Government responded that Defendant waived this issue by raising the argument far too late, citing Barany-Snyder v. Weiner, 539 F.3d 327, 331-332 (6th Cir. 2008), and in undeveloped way, citing McPherson v. Kelsey, 125 F.3d 989, 995-96 ( 6th Cir. 1997), Gen. Star Nat. Ins. Cor. v. Administratia Asigurarilor de Stat, 289 F.3d 434, 441 (6th Cir. 2002), United States v. Robinson, 390 F.3d 853, 886 (6th Cir. 2004), United States v. Cole, 359 F.3d 420, 428 n. 13 (6th Cir. 2004), and United States v. Johnson, 440 F.3d 832, 846 (6th Cir. 2006). (Docket Entry No. 62, at 2-3). The Government further responded that this argument fails on the merits because the municipal code does not conflict with the state statute and Tenn. Code. Ann. § 55-10-307(a) specifically authorizes municipalities to create traffic regulations in addition to the state equivalent. Id. at 3-5.

The Court concludes that Defendant has waived his constitutional challenge to the Municipal ordinance due to the late assertion and perfunctory nature of this claim. Barany-

Snyder v. Weiner, 539 F.3d at 331; McPherson, 125 F.3d at 995-96; Johnson, 440 F.3d at 846. Moreover, the Court has already held that the Government authenticated the ordinance at the suppression hearing and has admitted the ordinance as evidence. Under the law of the case doctrine, this ruling is the law of the case for subsequent stages of that same litigation, Arizona v. California, 460 U.S. 605, 618 (1983), that can be considered only in extraordinary circumstances. Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817 (1988). Defendant has not presented any extraordinary circumstances here. Thus, the Court adheres to its earlier ruling.

Under the express terms of Municipal Code § 12-16-110, "[n]o person shall turn a vehicle . . . to enter a private road or driveway, or otherwise turn a vehicle from a direct course, . . .unless and until such movement can be made with reasonable safety. No person shall so turn any vehicle without giving an appropriate signal in the manner hereinafter provided . . . [of a turn signal given] continuously during not less than the last fifty feet traveled by the vehicle before turning and until such movement can be made with reasonable safety." Municipal Code § 12-16-110 (a)(c) (emphasis added). Here, it is undisputed that Defendant turned left into an apartment complex without utilizing a left turn signal at any point. It is further undisputed that at the time of the turn, there was a car approaching Defendant's vehicle, Defendant's vehicle turned in front of the vehicle, and Detective Ranney's vehicle behind Defendant's vehicle had to brake. Accordingly, the Court concludes that with Detective Ranney's observation of this traffic violation probable cause existed that Defendant violated Municipal Code § 12-16-110 to justify the traffic stop of Defendant's vehicle.

The Government also argues that Defendant violated Tennessee Code Annotated § 55-8-143 because his failure to use the turn signal may have affected another driver. Defendant

contends that he did not violate state law because the turn did not impede any other driver, citing

United States v. Bias, No. 3:08cr52, 2008 WL 4683217 (E.D. Tenn. Oct. 20, 2008) and State v.

Gonzalez, 52 S.W.3d 90 (Tenn. Crim. App. 2000).

Tenn. Code Ann. § 55-8-143 provides, in pertinent part:

(a) Every driver who intends to start, stop or turn, or partly turn from a direct line, shall first see that that movement can be made in safety, and whenever the operation of any other vehicle may be affected by such movement, shall give a signal required in this section, plainly visible to the driver of the other vehicle of the intention to make such movement.

(b) The signal required in this section shall be given by means of the hand and arm, or by some mechanical or electrical device approved by the department of safety, in the manner specified in this section . . .

\* \* \*

(c) These signals shall be given continuously for a distance of at least fifty feet (50′) before stopping, turning, partly turning, or materially altering the course of the vehicle. . .[.]

(emphasis added).

In Bias and Gonzalez cited by Defendant, there were not any other cars in the vicinity of

the turning vehicle that could have been affected by the driver's failure to signal.  In Bias, the

court stated that the proper inquiry was whether the action may have affected the operation of

another vehicle.

The government contends that it need not demonstrate that other traffic was actually affected. Rather, claims the government, the proper focus is on whether other traffic may have been affected. This court agrees with the government insofar as the relevant inquiry is not actual proof that individual drivers were in fact affected by the failure to signal. Clearly such a standard would prove unworkable: to effectuate any proper stop an officer would have to pull over every driver in the vicinity to inquire as to whether the failure to turn actually affected them. As such, the word "may" operates to reduce the standard below proof that vehicles were actually affected. Nevertheless, the court does not agree with the government's contention that merely being in a commonly "high traffic area during a high traffic time of day" satisfies the statutory requirement.

Such an interpretation would tend to render meaningless the word "affected." Rather, the government must demonstrate that other drivers were present on the road or attempting to enter the road, not simply that there were people and vehicles in parking lots in the general vicinity.

\* \* \*

... Here, Officer Wardlaw conceded that he could not recall any other vehicles being on the roadway. Specifically, he affirmed that when the vehicle turned, "there was no other traffic right there at that intersection on Cherry." ... Further, another car did not approach until the vehicle and Officer Wardlaw's cruiser were already safely on Cherry Street. Tellingly, if Officer Wardlaw, who was behind the vehicle, was able to safely turn onto Cherry Street immediately behind the vehicle, any traffic which may later have approached the two vehicles on Cherry Street was not in a vicinity to have been "affected" by the driver's failure to signal. As there was "no traffic directly behind or around [the] vehicle," Gonzales, 52 S.W.3d at 99, there was no probable cause or even reasonable suspicion to believe that a traffic violation had occurred.

Bias, 2008 WL 4683217, at *3 (docket citations omitted). Similarly, in Gonzalez, there were no vehicles around or behind he defendant's vehicle when he made the turn and the officer testified that "he was not affected by [the driver's] turn." Gonzalez, 52 S.W.3d at 99.

Here, the undisputed facts are that there was an oncoming vehicle when Defendant turned left that was in the vicinity of Defendant's vehicle and that Defendant turned out in front of this car. According to the detectives, Defendant's acts did not actually affect the oncoming driver by causing this vehicle to swerve or slam on the brakes. Yet, the proper inquiry is whether the "operation of any other vehicle may be affected by" the turn, not whether any other vehicle was actually affected. Detective Ranney's had to "hit his brakes" and wait until the other car passed to turn left out after Defendant. Detective Pirtle had to apply his brakes because Detective Ranney applied his brakes. Both detectives testified that Defendant's intentions were unknown because he did not use a turn signal. Accordingly, the Court concludes that the officers had probable cause that Defendant violated Tenn. Code Ann. § 55-8-143 because a left turn without a

turn signal may have affected the movements of another vehicle that was then in the vicinity. See United States v. Mamoth, 113 F.3d 1236 (Table), 1997 WL 215511, *3 (6th Cir. 1997) ("In the present case, [the officer's] initial stop of the defendants' motor home was proper because he had probable cause to believe that they had committed a traffic violation . . . [The officer] had reasonable grounds . . . because he observed the driver . . . change lanes in the vicinity of another vehicle without the use of a turn signal. Despite his admitted lack of familiarity with traffic laws, Daniels stated that he believed he had witnessed a traffic violation. See Tenn. Code Ann. § 55-8-143(a) (1996)).

Because the Court has concluded that Detective Ranney had probable cause to effectuate the traffic stop based upon Defendant's turn signal traffic violation, the Government's alternate argument that the initial traffic stop was valid based upon reasonable suspicion of drug trafficking is moot.

### 2. Defendant's statements at traffic stop

Defendant argues that he was not advised of his Miranda rights at the correct time. (Docket Entry No. 57, at 6). The basis of this argument is that Defendant was placed into custody when Detective Ranney asked him to exit his vehicle and subject to improper interrogation when he was asked if there was anything illegal in the car, such that Miranda warnings were required at the inception of the traffic stop. Id. Therefore, the Defendant argues that "the statements and their fruit" must be suppressed under Wong Sun, 371 U.S. at 488. Id.

The Government responds that this was a valid Terry stop, the Defendant was not placed in custody by exiting his vehicle, and Detective Ranney's question was permissible, citing a number of cases such as Berkemer v. McCarty, 468 U.S. 420, 437 (1984), United States v. Ellis,

497 F.3d 606, 613-14 (2007), United States v. Hill, 195 F.3d 258, 269 (6th Cir. 1999), and

United States v. Burton, 334 F.3d 514, 518-19 (6th Cir. 2003). (Docket Entry No. 58, at 16-18).

In Berkemer, the Supreme Court considered "whether the roadside questioning of a

motorist detained pursuant to a routine traffic stop should be considered 'custodial

interrogation.'" 468 U.S. at 435. The Supreme Court held that "persons temporarily detained

pursuant to such stops are not 'in custody' for the purposes of Miranda." Id. at 440. The

Supreme Court further explained: "Typically, this means that the officer may ask the detainee a

moderate number of questions to determine his identity and to try to obtain information

confirming or dispelling the officer's suspicions." Id. at 439. See also Arizona v. Johnson, 555

U.S. 323, 129 S.Ct. 781, 784 (2009) ("[W]e hold that, in a traffic-stop setting, the first Terry

condition-a lawful investigatory stop-is met whenever it is lawful for police to detain an

automobile and its occupants pending inquiry into a vehicular violation. The police need not

have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity.").

In United States v. Everett, 601 F.3d 484 (6th Cir. 2010), the Sixth Circuit restated its

prior holding that traffic stops are governed by Terry reasonable suspicion standards, not

probable cause. The Sixth Circuit summarized this circuit's the traffic stop jurisprudence as

follows:

> Of course, "a seizure that is lawful at its inception can violate the Fourth
> Amendment if its manner of execution unreasonably infringes interests protected
> by the Constitution." Illinois v. Caballes, 543 U.S. 405, 407 (2005). We must
> therefore determine whether Ford's execution of the traffic stop complied with the
> standard for temporary detentions set forth in Terry v. Ohio, 392 U.S. 1 (1968),
> and its progeny. See United States v. Hill, 195 F.3d 258, 264 (6th Cir.1999)
> (stating that "the principles announced in Terry v. Ohio apply to define the scope
> of reasonable police conduct" during traffic stops (internal citation omitted)).

> FN4. We note that the Supreme Court has never squarely held that
> the permissible scope of all traffic stops is governed by Terry. In
> Berkemer v. McCarty, 468 U.S. 420 (1984), the Court observed

> that in duration and atmosphere, "the usual traffic stop is more
> analogous to a so-called <u>Terry</u> stop than to a formal arrest." <u>Id</u>. at
> 439 (internal citation omitted) . . . More recently, however, a
> unanimous Court noted "<u>Terry's</u> application in a traffic-stop
> setting" and analyzed a traffic stop as an "investigatory stop"
> rather than an arrest, even though there was no question that
> probable cause for the stop existed. <u>Johnson</u>, 129 S.Ct. at 784. <u>In</u>
> <u>any event, we are bound by this circuit's unqualified holding in</u>
> <u>Hill—itself a case where probable cause existed—that traffic stops</u>
> <u>are governed by Terry</u>. 195 F.3d at 264.

<u>Id</u>. at 488 (emphasis added).

Both the Supreme Court and Sixth Circuit have held that an officer is justified in asking a

driver to exit his car when effectuating a traffic stop. In <u>Pennsylvania v. Mimms</u>, the Supreme

Court held as follows:

> Against this important interest we are asked to weigh the intrusion into the
> driver's personal liberty occasioned not by the initial stop of the vehicle, which
> was admittedly justified, but by the order to get out of the car. We think this
> additional intrusion can only be described as <u>de</u> <u>minimis</u>. The driver is being
> asked to expose to view very little more of his person than is already exposed.
> The police have already lawfully decided that the driver shall be briefly detained;
> the only question is whether he shall spend that period sitting in the driver's seat
> of his car or standing alongside it. Not only is the insistence of the police on the
> latter choice not a "serious intrusion upon the sanctity of the person," but it hardly
> rises to the level of a " 'petty indignity.' " <u>Terry v. Ohio</u>, 392 U.S. at 17. What is
> at most a mere inconvenience cannot prevail when balanced against legitimate
> concerns for the officer's safety.

434 U.S. 106, 111 (1977) (footnote omitted).

In <u>United States v. Street</u>, 614 F.3d 228, 232 (6th Cir. 2010), the Sixth Circuit held that

the officers legitimately asked the Defendant to exit the car during a traffic stop. In so holding,

the Sixth Circuit stated:

> In the course of a stop premised on a traffic violation, police may instruct the
> driver or occupant to exit the vehicle. <u>Mimms</u>, 434 U.S. at 111. Traffic stops are
> "fraught with danger to police officers," <u>Michigan v. Long</u>, 463 U.S. 1032, 1047
> (1983), and the Fourth Amendment permits officers to conduct an otherwise-
> legitimate stop on their own terms—whether by keeping the driver (and
> occupants) in the car or by asking them to exit the car, <u>see Maryland v. Wilson</u>,

519 U.S. 408, 415 (1997); <u>Mimms</u>, 434 U.S. at 111, depending on what they perceive as safer. Having stopped Street for a traffic violation, the police permissibly asked Street to get out of the car.

<u>Id</u>. at 232.

Similarly, in <u>United States v. Dixon</u>, No. 09–3996, 405 Fed. Appx. 19 (6th Cir. Dec. 15, 2010), the Sixth Circuit held it was in the officer's discretion whether to ask the driver to exit a vehicle, stating:

> Officer Frisby had not completed his traffic stop when he requested that Dixon exit the vehicle because Officer Frisby had not yet completed his actions in connection with the issuance or non-issuance of a citation to Rose for driving a vehicle with only a single operative headlight. Therefore, our prior decisions discussing improper prolongations of traffic stops are not implicated; Officer Frisby was within his rights to request that Dixon exit the car for safety reasons while in the course of issuing a citation, even if the citation could have been issued with Dixon remaining within the car and even though removing Dixon from the car prolonged the traffic stop by approximately thirty seconds, as timed by a video recording of the encounter.

<u>Id</u>. at 22. <u>See</u> also <u>e.g.</u>, <u>United States v. Hill</u>, 195 F.3d at 269; <u>Burton</u>, 334 F.3d at 518-19.

Therefore, the Court concludes that Detective Ranney was justified in asking Defendant to exit his vehicle and the Defendant's argument that this request transformed the <u>Terry</u> temporary detention into a custodial situation lacks merit.

The Court next addresses Defendant's argument that Detective Ranney's single question of whether there was anything illegal in the car was improper. "A law enforcement officer does not violate the Fourth Amendment merely by asking a detained motorist extraneous questions so long as those questions do not unnecessarily prolong the detention, and the detainee's responses are voluntary and not coerced." <u>United States v. Aguilera-Pena</u>, No. 09-1535, 2011 WL 2173729, *2 (6th Cir. June 2, 2011) (citing <u>Everett</u>, 601 F.3d at 496 and <u>Johnson</u>, 129 S.Ct. at 788).

In <u>Everett</u>, an officer conducted a traffic stop for speeding. 601 F.3d at 486. After asking for defendant's license and registration, the officer asked Defendant to exit the vehicle. <u>Id</u>. at 486-87. Next, the officer "did not immediately continue with what she testified was standard traffic-stop procedure . . . Nor did she directly proceed to write Everett a speeding ticket. Instead, [the officer] at once asked him 'if he had anything illegal on his person, any weapons or narcotics or anything like that, or anything illegal in his vehicle.'" <u>Id</u>. The defendant responded to this question with the incriminating statement that he "had an open forty-ounce beer and a .410 shotgun, which ... he knew he was not supposed to have because he was a convicted felon." <u>Id</u>. The officer then asked defendant what "his conviction was for, and he answered 'drugs.' [The officer] then asked if Everett had 'any other weapons or anything else on his person she needed to know about.' He said he did not. [The officer] asked if she could check; Everett agreed. Upon conducting a pat-down, she found two baggies of marijuana in his jacket pocket." <u>Id</u>. The officer did not give defendant <u>Miranda</u> warnings prior to these questions or defendant's incriminating responses. <u>Id</u>.

In upholding the traffic stop and concluding that the officer's question about illegal items was permissible, the Sixth Circuit explained its rationale as follows:

> We never joined those circuits in categorically restricting the topic of officers' questions during traffic stops. <u>In fact, in one case, we held that an officer did not violate Terry by asking "a few" off-topic questions during a traffic stop, including "whether there was anything illegal inside [the automobile]," in the absence of any reasonable suspicion of illegal activity beyond the traffic violation.</u> <u>See</u> <u>United States v. Burton</u>, 334 F.3d 514, 515 (6th Cir. 2003). We took particular note that "the traffic stop took place ... [in a known] high-crime area ... at 11:30 p.m." and that "[t]he record provide[d] no reason to suspect either that these questions were unusually intrusive or that asking them made this traffic stop any more coercive than a typical traffic stop." <u>Id</u>. at 518–19. . . [.]

\* \* \*

. . . [N]either party disputes that Ford's initial question about "weapons or narcotics ... or anything illegal" in theory extended the stop by a few seconds.FN7 Moreover, neither of those cases specifically addressed what the outcome would have been if the questioning at issue had prolonged the defendants' respective seizures. Therefore, we must look to the reasoning underlying Muehler[8] and Johnson[9], and to the animating principles of the Supreme Court's Fourth Amendment case law as a whole, to determine whether the questioning that occurred here was permissible.

> FN7. We need be concerned only with the propriety of Ford's initial question. Assuming her initial question was proper, Everett's response to this question—that he "had an open forty-ounce beer and a .410 shotgun, which ... he knew he was not supposed to have because he was a convicted felon"—gave Ford separate grounds to search and/or arrest him for driving with an open container of alcohol, see Tenn.Code Ann. § 55–10–416(a)(1), or for a firearm violation. Thus, the length of time expended through further questioning was irrelevant. On the other hand, if the prolongation caused by her initial question violated the Fourth Amendment, all that followed was suppressible as "fruit of the poisonous tree." See Wong Sun v. United States, 371 U.S. 471, 488 (1963).

\* \* \*

Importantly, in evaluating whether an officer's prolongation of a traffic stop through extraneous questions indicates a lack of diligence, the subject of those questions, no less than their quantity, is part of the "totality of the circumstances" of the stop, and is therefore a relevant consideration . . . [.]

\* \* \*

Additionally, the Supreme Court has emphasized that "the safety of the officer" during a traffic stop is a "legitimate\*and weighty" interest. Pennsylvania v. Mimms, 434 U.S. 106 (1977) . . . Questions directed toward officer safety, therefore, do not bespeak a lack of diligence.

\* \* \*

At other times, however, an officer's questions will be relevant only to ferreting out unrelated criminal conduct. Because the reasonable diligence standard does not "require[an officer] to move at top speed" . . . here, too, some amount of questioning is permissible—so long as the officer's overall course of action during a traffic stop, viewed objectively and in its totality, is reasonably directed toward the proper ends of the stop. . . [.]

---

[8] Muehler, v. Mena, 544 U.S. 93 (2005).
[9] United States v. Johnson, 555 U.S. 323 (2009).

FN12. Importantly, it is the objective conduct of the officer which the diligence standard measures; his subjective intent or hope to uncover unrelated criminal conduct is irrelevant. See Whren, 517 U.S. at 813.

Judged by this standard, this case is not remotely close. First of all, Ford's question specifically raised the subject of "weapons," which is reasonably related to the "legitimate and weighty" consideration of officer safety. Mimms, 434 U.S. at 110, 98 S.Ct. 330. While safety considerations are always relevant, they have even greater salience here, as Ford had grounds to suspect that Everett was intoxicated. . . [.]

And, while Ford also mentioned "narcotics" and other "illegal" items—which are less directly related to officer safety—the additional delay caused by the insertion of several extra words, under the totality of the circumstances, does not signify a lack of diligence. We emphasize that Ford asked only a single question before Everett confessed to possessing an illegal gun and an open container of alcohol, giving her probable cause to arrest him and search the car. It cannot be said that this single question, in the situation Ford confronted, constituted a definitive abandonment of the prosecution of the traffic stop in favor of a sustained investigation into drug or firearm offenses.FN13 Nor did this single question, taking up several seconds, constitute the bulk of the interaction between Ford and Everett. Accordingly, Ford's questioning did not render the traffic stop an unreasonable seizure under the Fourth Amendment.

   FN13. As it happens, the question did, in fact, result in a sustained
   investigation into other offenses, once Everett immediately
   confessed to possessing contraband, giving rise to probable cause.
   Ford, however, cannot be faulted for this fortuitous outcome.

Id. at 489, 490-91, 494, 495-96 (emphasis added and certain footnotes omitted). See also e.g.,

Aguilera-Pena, 2011 WL 2173729, at *1, 3 (in a traffic stop case where officer suspected drug

activity, upheld traffic stop where officer "asked several questions, including: (1) if Smith should

know about anything inside the vehicle, (2) if there was any marijuana or cocaine in the vehicle,

and (3) whether there were any large sums of money in the car." Noting that the officer only

asked a handful of questions, defendant consented to search after approximately two minutes,

and no evidence questions unnecessarily prolonged detention, Sixth Circuit held "extraneous

questions were appropriate" and defendant's own statements gave probable cause for further

detention.); United States v. Biles, 100 Fed.Appx. 484, 486, 490, 2004 WL 1303353 (6th Cir. June 9, 2004) (in a traffic stop where officer suspected drug activity, Sixth Circuit upheld officer's question if there were weapons or drugs, holding: "Officer Martin asked Jerry Biles if the truck contained weapons or drugs—and for permission to search it—in the course of a legitimate traffic stop and did not threaten retaliation for refusing to answer the questions or give consent to the search. Under these circumstances, such requests are reasonable.").

Here, Detective Ranney asked a single question and Defendant immediately responded with an incriminating response. The uncontroverted testimony was that Detective Ranney's question and Defendant's answer occurred within the first five to six seconds of the traffic stop. Everett controls and Detective Ranney's question did not unnecessarily prolong the traffic stop and did not constitute "a definitive abandonment of the prosecution of the traffic stop in favor of a sustained investigation into drug or firearm offenses. Nor did this single question, taking up several seconds, constitute the bulk of the interaction" between Defendant and the officers at the traffic stop. 601 F.3d at 495-96. Detective Ranney also did not threaten retaliation if Defendant refused to answer. Detective Ranney's initial question was permissible under established Sixth Circuit precedent and Defendant's response that he had just messed up his life and his admission there was cocaine in the center console of his vehicle provided probable cause for Detective Ranney to arrest the Defendant and search his vehicle for cocaine. Id. at 491, n. 7. After the officers searched the vehicle and recovered drugs and a scale, the Defendant was placed under arrest and was given his Miranda rights. Accordingly, the Court concludes that Detective Ranney's question was appropriate under the circumstances and the traffic stop permissible.

### 3. Validity of consent search of Defendant's residence

Here, Defendant argued in his initial brief as follows: "At the very end of the traffic stop, Detective Ranney presented Pittman with a written "Consent to Search" document. Without reading the document, and feeling threatened and worn out by the long detention, Pittman signed it." (Docket Entry No. 30, at 7). Defendant did not discuss this argument in his other briefs or at the suppression hearing.

The Government responds that the Defendant gave both verbal and written consent to the search of his residence and there was not any evidence that his consent was coerced. (Docket Entry No. 58, at 19; Docket Entry No. 47, at 10; Docket Entry No. 31, at 5).

Whether Defendant's consent to search his residence "was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). Here, the uncontroverted proof was that the officers did not threaten or coerce Defendant at any point. The officers testified that the Defendant provided verbal and written consent to search and the Defendant did not exhibit any lack of understanding of his rights and did not ask any questions. Moreover, Defendant expressed his desire to cooperate and possibly assist in future drug transactions. Considering the totality of the circumstances, the Court concludes that the proof establishes the Defendant's consent to the search of his residence to be voluntary and rendering the resulting search valid.

## C. CONCLUSION

For the foregoing reasons, Defendant's motion to suppress (Docket Entry No. 30)

should be denied.

An appropriate Order is filed herewith.

Entered on this the _____ day of August, 2011.

WILLIAM J. HAYNES, JR.
United States District Judge